# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| *MAINE MEDICAL CENTER, et al.,* ) | |
| ) | |
| *Plaintiffs* ) | |
| ) | |
| *v.* ) | *No. 2:13-cv-309-NT* |
| ) | |
| *SYLVIA BURWELL,* [1] ) | |
| *Secretary, United States Department of* ) | |
| *Health and Human Services,* ) | |
| ) | |
| *Defendant* ) | |

## RECOMMENDED DECISION ON CROSS-MOTIONS FOR JUDGMENT ON ADMINISTRATIVE RECORD

The plaintiffs, eight Maine hospitals, seek relief from a decision of the defendant that overturned a decision of the Medicare Provider Reimbursement Review Board ("Board" or "PRRB") directing the Fiscal Intermediary to repay them approximately $17,127,665 in Medicare disproportionate share hospital payment reimbursement that the Fiscal Intermediary had recouped from the plaintiffs. I recommend that the court grant the parties' respective motions for judgment in part.

## I.       Factual and Procedural Background

The following facts are not disputed by the parties.

Medicare is a national program of health insurance for the aged and disabled. 42 U.S.C. § 1395 *et seq.* Medicare reimburses hospitals for the costs of inpatient hospital services through the Prospective Payment System, which bases payments on prospectively-determined rates rather

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sylvia Burwell is substituted as the defendant in this matter.

than actual costs. 42 U.S.C. § 1395ww(d)(1)–(4). Statutory provisions adjust payments based on hospital-specific factors. 42 U.S.C. § 1395ww(d)(5).

This case involves the application of one of these provisions, the adjustment for disproportionate share hospital ("DSH") reimbursement. 42 U.S.C. § 1395ww(d)(5)(F). The DSH provision requires the defendant to provide increased prospective payments to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i). The amount of the adjustment, where it is available, depends upon the hospital's "disproportionate patient percentage." 42 U.S.C. § 1395ww(d)(5)(F)(v). The disproportionate patient percentage is the sum of the "Medicare fraction" and the "Medicaid fraction." 42 U.S.C. § 1395ww(d)(5)(F)(vi).

The Medicaid fraction is defined as follows:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under [the Medicaid program], but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The numerator of the Medicare fraction is the number of Medicare inpatient days for patients who were entitled to Supplement Security Income ("SSI") benefits and the denominator is the total number of Medicare inpatient days. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

Prior to February 1997, the defendant construed the phrase "eligible for medical assistance under [the Medicaid program]" to include in the Medicaid numerator only those days for which the hospital received Medicaid payment for inpatient hospital services. Record at 369-70. However, in HCFA Ruling 97-2, the defendant construed the statutory phrase to include any day

on which the patient was eligible for Medicaid, regardless of whether a Medicaid payment had been made for such day. *Id*.

In a memorandum dated June 13, 1997, directed to the intermediary agencies that processed prospective payments to hospitals,[2] the defendant noted that the statute precluded the inclusion in the Medicaid numerator of "days furnished to patients entitled to both Medicare Part A and Medicaid." *Id*. at 357-59. The defendant thus instructed its fiscal intermediaries to subtract "dual entitlement days" from the calculation. *Id*. at 358. The plaintiffs refer to dual-eligible days as "non-SSI Type 6 Days." Motion for Judgment on Administrative Record ("Plaintiffs' Motion") (ECF No. 20) at 1.

In December 1999, the defendant issued Program Memorandum, HCFA Pub. 60A, No. A-99-62 to its fiscal intermediaries, noting that some states provided medical assistance to individuals who were not eligible for Medicaid, and that such "state-only" days were not appropriately included in the Medicaid numerator. Record at 399-401. The Memorandum reiterated that days on which the patient was entitled to both Medicare Part A and Medicaid were not included in the calculation. *Id*.

At the end of each fiscal year, each plaintiff is required to file a Medicare cost report with its fiscal intermediary. 42 C.F.R. § 413.24(f). The report identifies the hospital's costs and the percentage of those costs allocated to services furnished to Medicare beneficiaries. 42 C.F.R. §§ 413.20, 413.24. The intermediary analyzes the cost report, audits it if necessary, and issues a notice of program reimbursement, identifying the amount due the hospital from Medicare for the period. 42 C.F.R. § 405.1803.

---

[2] A fiscal intermediary is "typically a private insurance company acting as the agent of" the Secretary of DHHS. *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 917-18 (D.C. Cir. 2013).

A fiscal intermediary may reopen a cost report within three years of the date of the notice of program reimbursement by notifying the parties. 42 C.F.R. § 405.1885(a) & (b)(1). If the reopening results in a revision of the prior decision, the fiscal intermediary is required to issue a notice that includes a complete explanation of the basis for the revision. 42 C.F.R. § 405.1887(c).

A hospital may obtain a hearing on an original or revised notice of program reimbursement before the Board, if certain jurisdictional conditions are met. 42 U.S.C. § 1395oo; 42 C.F.R. § 405.1889. The Board's decision is final, unless the Secretary reverses or modifies the decision within 60 days. 42 U.S.C. § 1395oo(f)(1). The hospital may obtain judicial review of any final decision. *Id*.

In 1997, one of the plaintiffs, Central Maine Medical Center, settled an appeal it had brought to the Board. Record at 1320-23. One of the terms of the settlement agreement required the defendant to allow the hospital to include non-SSI Type 6 Days in the calculation of the disproportionate share hospital reimbursement. *Id*. at 1343-44. After this settlement was reached, the plaintiffs' fiscal intermediary began to include the non-SSI Type 6 Days for all other Maine hospitals. *Id*. at 1348. It prepared instructions to Maine hospitals setting out the manner in which non-SSI Type 6 Days were to be handled in connection with the hospitals' cost reports. *Id*. at 1348-49. The fiscal intermediary sent letters to Maine hospitals encouraging them to claim the non-SSI Type 6 Days. *Id*. at 1366-67.

In 2003, the fiscal intermediary changed its position on this issue.[3] *Id*. at 229-30. It issued a memorandum dated May 19, 2003, advising the plaintiffs that dual-eligible days should be excluded from the calculation. *Id.* at 373-75. In letters dated from June 9, 2003, to September 27,

---

[3] The defendant says that the fiscal intermediary "realized that these DSH payments had been made in error." Defendant's Motion for Judgment on the Administrative Record, and Opposition to Plaintiffs' Motion for Judgment on the Administrative Record ("Defendant's Motion") (ECF No. 21) at 7. The page of the record that the defendant cites in support of this characterization cannot reasonably be read to do so. Record at 176.

2004, the fiscal intermediary notified the plaintiff hospitals that it was reopening their cost reports for certain years "[t]o review and correct the [Medicare DSH] payment calculation in accordance with" the Medicare statute and regulations. *Id*. at 73, 76-80.

Representatives of the plaintiffs and the fiscal intermediary met with program authorities in the defendant's regional office in Boston and with the acting deputy director of CMS (the Centers for Medicare and Medicaid Services), a division of the Department of Health and Human Services, in Washington, D.C. *Id*. at 230. During a subsequent conference call, CMS representatives did not suggest that the "without fault" analysis found in the Medicare Intermediary Manual, Section 3708.1 did not apply under the circumstances. *Id*. at 230[60]. This provision required each plaintiff to make "full disclosure of all material facts," and show that "on the basis of information available to it, including, but not limited to, the Medicare instructions and regulations, it had a reasonable basis for assuming that the payment was correct[.]" *Id*. at 231 [62].

The CMS representatives agreed that the plaintiffs made full disclosure, but they concluded that the plaintiffs did not satisfy the second prong of this test because the statute involved was "clear" in prohibiting hospitals from counting dual-eligible patients in the Medicaid fraction. *Id*. at 230 [60].

By letters dated June 20, 2005, to August 2, 2007, the fiscal intermediary advised the plaintiffs that the dual-eligible days would be excluded from the DSH calculations for the affected years. *Id*. at 74-75, 83-84, 85-86, 87-88, 145-46. The fiscal intermediary issued final reopening determinations in letters dated January 25 to August 18, 2006. *Id*. at 148-49, 512-13. Each notice advised the hospital of the amount due based on the revised DSH calculation.

The appeals of the plaintiffs were consolidated. *Id*. at 57. The Board held a hearing and issued a decision on March 29, 2013. *Id*. at 51-70. The Board found that the fiscal intermediary

had issued timely and adequate notices of reopening for certain of the cost reports at issue, and affirmed the adjustments for these reports. *Id*. at 65. However, it found that the fiscal intermediary had failed to issue timely and adequate notices for the remaining cost reports, and, therefore, reversed the disallowances imposed by the fiscal intermediary for those years. *Id*. at 65-66.

On April 19, 2013, the defendant notified the parties that she would review the Board's decision. *Id*. at 39. On May 30, 2013, she reversed the Board's decision that certain of the cost reports had been improperly reopened and rejected all other arguments that had been raised by the plaintiffs. *Id*. at 2-29.

## II.     Applicable Legal Standard

Judicial review of the defendant's decision is governed by 42 U.S.C. § 1395oo(f), which incorporates by reference the standard of review applicable under the Administrative Procedure Act, 5 U.S.C. § 706. 42 U.S.C. § 1395oo(f)(1). A reviewing court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the "arbitrary and capricious" standard is narrow, and a court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.     Discussion

### A. Timeliness

The plaintiffs first argue that the secretary's decision was untimely and, therefore, void. Plaintiffs' Motion at 16-18. Specifically, they argue that the secretary was required to act on the Board's decision by June 1, 2013, but her decision was sent to them with a cover letter dated June 4, 2013 and was not received until June 12 or 13, 2013, citing their complaint and the defendant's answer. *Id*. at 16; Complaint, ECF No. 1, ¶ 44; Answer, ECF No. 11, ¶ 44. The statute upon which

this argument relies is 42 U.S.C. § 1395oo(f)(1), which provides, in relevant part, that the Board's decision becomes final "unless the Secretary . . . within 60 days after the provider . . . is notified of the Board's decision, reverses, affirms or modifies the Board's decision." The defendant's representative apparently signed the decision on May 30, 2013. Record at 29.

In support of their contention that the applicable statute requires actual receipt by the provider of the defendant's decision within the 60-day period, the plaintiffs cite the defendant's interpretation of 42 U.S.C. § 1395oo(a)(3). They cite *Visiting Nurses Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 73-74 (1st Cir. 2006), and *Sun Towers, Inc. v. Heckler*, 725 F.2d 315 (5th Cir. 1984), as "two cases that have previously addressed the question of the timeliness of the Secretary's decision[,]" which they attempt to distinguish. Plaintiffs' Motion at 17-18.

The defendant responds that her signature on May 30 rendered the decision timely, and that the applicable statute and regulation merely required her to mail the decision "promptly" to the plaintiffs thereafter. Defendant's Motion at 10. The relevant portion of the statute provides that "[a] decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision." 42 U.S.C. § 1395oo(f)(1). The regulation provides, in relevant part:

> The date of rendering of any decision by the Administrator must be no later than 60 days after the date of receipt by the provider of the Board's decision or other reviewable action. The Administrator must promptly mail a copy of his or her decision to the Board, to each party to the appeal, to CMS, and, if applicable, to any other affected nonparty.

42 C.F.R. § 405.1875(e)(2).[4]

---

[4] The plaintiffs asserts that the requirement of "prompt mailing" "has now been deleted" from this regulation, Plaintiff's Motion at 17, but cite no authority in support of the assertion. The text quoted in the body of this opinion is currently in effect.

The two cited cases support the defendant's position. In *Sun Towers*, the Fifth Circuit noted that the statute does not include an "additional requirement that the decision must be entered on any docket or mailed within that 60-day review period." 725 F.2d at 324. It concluded that mailing the decision five days after it was signed was not untimely under the regulatory requirement that the parties be notified "promptly" of the decision. *Id*. at 325 n.15. In *Visiting Nurse*, a decision that binds this court, the First Circuit, interpreting the nearly identical regulatory language ("will promptly mail a copy of the decision to each party"), held that the regulation does not require that the decision be mailed within the 60-day period. 447 F.3d at 73-74.

The plaintiffs argue that the fact that the defendant requires that provider appeals be received by the Board prior to a 180-day deadline in a separate subsection of 42 U.S.C. § 1395oo means that the First Circuit "would likely not have made the same decision[.]" Plaintiffs' Motion at 18. To the contrary, that subsection of the statute requires that an appealing provider "file[] a request for a hearing within 180 days after notice of the intermediary's final determination[.]" 42 U.S.C. § 1395oo(a)(3). This explicit limit for filing an appeal contrast notably with the lack of any time limit in the statute for notifying providers of the secretary's decision. It also differs significantly from the less-specific regulatory requirement of "prompt" notification of parties. The plaintiffs take nothing by this argument.

Finally, the plaintiffs complain that the administrator's dated signature on the notice is not "conclusive proof" that the decision was actually signed on that date. Plaintiffs' Motion at 18. In response, the defendant filed the Declaration of Jacqueline R. Vaughn (ECF No. 22), which establishes conclusively that the decision was in fact signed on the date stated on the signature page. Declaration of Jacqueline R. Vaughn ¶ 6(b). The plaintiffs promptly objected to "the Secretary's attempt to improperly augment the administrative record with a new affidavit of Ms.

Jacqueline Vaughn."  Plaintiff[]s['] Reply to Defendant's Motion and Incorporated Memorandum for Judgment on the Administrative Record ("Plaintiffs' Reply") (ECF No. 23) at 1.  They cite no authority in support of this argument.

The plaintiffs' argument, if adopted, would mean that the dated signature of any government official on an official document cannot be presumed to be valid unless accompanied by contemporaneous "conclusive proof" that the document had in fact been signed on that date.  If applied retroactively, as the plaintiffs contend that it should be here, such a legal standard would make it impossible for most official government documents to be acceptable evidence in court or to be deemed valid for any other purpose.  However, the contention that a subsequent sworn statement verifying the signing as of the date indicated is barred as "improper augmentation" of the administrative record fails on its face.  The affidavit does not present information that the defendant could have presented during the administrative proceedings, because the issue of the validity of the date of the signature on the document that ended the administrative proceedings could not have been raised during the proceedings.  The affidavit does not seek to explain evidence in the administrative record; it is used here merely to respond to an inference first raised by the plaintiffs in this action.  The plaintiffs cannot reasonably expect to raise questions about the validity of the date on the document that establishes this court's jurisdiction and then have the court prevent the defendant from establishing its validity.  *See generally Green v. National Archives & Records Admin.*, 992 F. Supp. 811, 821 (E.D. Va. 1998) (affidavits are acceptable to fill gaps in record to determine what agency actually did).

## B.  Inclusion of Non-SSI Type 6 Days in Medicare Fraction

The plaintiffs contend that Congress intended the DSH calculation to include all Medicaid-eligible days, based on committee reports and legislative history.  Plaintiffs' Motion at 18-21.  In

support of this position, they cite *Jewish Hospital, Inc. v. Secretary of Health & Human Servs.*, 19

F.3d 270 (6th Cir. 1994), and a statement of the CMS Administrator in 2000. The Sixth Circuit

said:

> This Court thus finds that the House of Representatives acted to substantially define the Medicaid proxy. Congress intended to include all days attributable to Medicaid beneficiaries in the proxy. Accordingly, an interpretation that is contrary to this intention must be stricken.

19 F.3d at 276.

The CMS Administrator said:

> As reflected in the Senator's statements, generally, the Medicare proxy was intended to capture the Medicare/Medicaid dual eligible, i.e., the aged low-income patient, as the low-income proxy. The Medicaid proxy was intended to capture the "nonaged" i.e., nonMedicare, Medicaid patient as the low-income proxy. Thus, the Medicare proxy and the Medicaid proxy, together, include Medicaid/Medicare "dual eligibles" and Medicaid patients in the DSH patient percentage.

HCFA Administrator Decision, *Edgewater Medical Center v. Blue Cross and Blue Shield

Association/Blue Cross and Blue Shield of Illinois*, CCH Medicare & Medicaid Guide, ¶ 80,525

(June 19, 2000), Record at 366. The footnote to this passage provides: "The prohibition of

counting Medicare patients in the Medicaid proxy could be considered a prophylactic rule to

prevent double counting of patients and, thus, days in both the Medicate and Medicaid proxy."

*Id.*[5]

The defendant responds, correctly, that resort to legislative history is only allowed when

the statutory language at issue is ambiguous, *General Motors Corp. v. Darling's*, 330 F.Supp.2d

9, 11 (D. Me. 2004), and, she contends, the statutory language at issue here is not ambiguous.

---

[5] The Administrator's decision in that case was that, "based on the plain language of the statute and the intent of Congress, the Administrator finds that days of dually eligible patients are not included in the DSH calculation regardless of whether these days include patients who have exhausted their Medicare Part A benefit." *Id.* at 366. Given this conclusion, the Administrator's summary of Senator Dole's position does not appear to provide support for the plaintiffs' position.

Defendant's Motion at 13-16. The plaintiffs do not address this threshold issue in their motion or in their response to the defendant's motion.

The statutory language at issue is part of the definition of the Medicaid fraction, "the numerator of which is the number of the hospital's patient days for such period which consist of *patients who (for such days) were eligible for medical assistance under [the Medicaid program], but who were not entitled to benefits under Part A of [Medicare.*]" 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). The defendant's contention that this language "compels" the decision reached in this case by the defendant, Defendant's Motion at 13, is undermined by the fact that the defendant's designated fiscal intermediary for the plaintiffs urged them to take a contrary approach for up to six years.

If it were appropriate to resort to consideration of the legislative history of 42 U.S.C. § 1395ww, I agree with the defendant, Defendant's Motion at 17, that the legislative history is itself less than pellucid, for the reasons ably set forth by the Fourth Circuit in *Cabell Huntington Hosp., Inc. v. Shalala,* 101 F.3d 984, 990-91 (4th Cir. 1996). Resort to the full legislative history, not limited to the portions briefly excerpted by the plaintiffs, Plaintiffs' Motion at 19-20, would at best create further ambiguity, which use of that approach does not permit, Santana *v. Holder*, 731 F.3d 50, 59 (1st Cir. 2013), in statutory language that has already been described as "downright byzantine [with] its meaning not easily discernible." *Catholic Health*, 718 F.3d at 916.

If the statutory language is ambiguous, a reviewing court must consider whether that agency's interpretation of the statutory language "is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). In cases involving interpretation of a related portion of the statutory definition at issue here—the meaning of the phrase "entitled to benefits under Part A"—courts have upheld the defendant's

interpretation. *E.g., Catholic Health*, 718 F.3d at 918-20; *Metropolitan Hosp. v. United States Dep't of Health & Human Servs.*, 712 F.3d 248, 265-66 (6th Cir. 2013); *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 11-14 (D.C. Cir. 2011) *Allina Health Sys. v. Sebelius*, 982 F.Supp.2d 1, 7-8 (D.D.C. 2013). The reasoning of those courts, applied to this dispute, suggests that the defendant's interpretation of the statutory language defining the Medicaid fraction is based on a permissible construction of that language.

The defendant concedes that DHHS policy on this issue changed in 1997. Defendant's Motion at 4. Thus, case law based on events occurring before the date of HCFA Ruling 97-2 is of limited value in assessing the defendant's current position.

The plaintiffs assert that the defendant's interpretation of the statutory language at issue contravenes the "clear" purpose of "the DSH statute," which they characterize as a recognition "that poor patients, especially the poor elderly, require more intensive, and thus more expensive, car." Plaintiffs' Motion at 22. The exclusion of "a large segment of this population from the DSH calculation," they assert, "leads to [an] absurd result." *Id.* at 22-23. No authority is cited in support of this argument.

The defendant counters that the definition of the Medicaid fraction in the statute is intended only to serve as a "proxy" for low-income patients, not meant to provide an exact number of low-income patients actually served, but instead to approximate the disproportionate share of care provided to such patients. Defendant's Motion at 19-20. She supports this position with citations to *Allina*, 982 F.Supp.2d at 11 ("[I]t bears emphasis that the DSH proxy is just that—a proxy, not an exact calculation. Thus, to the extent that some patients days were not captured by the Secretary's calculation of the hospitals' DSH adjustments, this does not necessarily render her interpretation impermissible or unreasonable."); *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 42-

43 (1st Cir. 2008) (noting definition of "proxy" as variable that can be used as an indirect estimate of another variable with which it is correlated).

I do not agree that exclusion of some hospital days incurred in serving low-income patients from the Medicaid fraction for purposes of the DSH adjustment proxy necessarily leads to an absurd result, particularly in the absence of any showing that the statute contemplates use of actual numbers rather than proxies.[6]

## C. Plaintiffs Without Fault

The plaintiffs' next argument contends that they are entitled to a waiver of liability for any repayment under 42 U.S.C. § 1395gg, or, in the alternative, that they should be held harmless under the defendant's Program Memorandum, HCFA Pub. 60A, No. A-99-62 (December 1, 1999).

Under certain circumstances, CMS may not collect an overpayment if the recipient is without fault. 42 U.S.C. § 1395gg(c). As noted above, a provider is without fault if it made full disclosure of all material facts and it had a reasonable basis for assuming that the payment was correct. Medicare Intermediary Manual § 3708.1.

The defendant argues that section 1395gg and the Program Intermediary Manual are not reached in this case because they apply only to overpayments made to individuals and for which no other individual can be held liable. Defendant's Motion at 25-26. The plaintiffs contend that, because the "payment adjustment factor" at the heart of the DSH results in "an enhanced DRG payment for *each* Medicare discharge during its fiscal year[,]" Plaintiffs' Motion at 25 (emphasis in original), it is essentially a payment made "to individuals." The contention that section

---

[6] The plaintiffs assert that "the Medicare Fraction does not include all Medicare/Medicaid dual eligible patients, at least in Maine[,]" and that, as a result, "either the rationale for CMS' DSH policy is fatally flawed, or CMS' DSH policy, as applied in Maine, is fatally flawed." Plaintiffs' Motion to 21 (emphasis in original). They cite no authority for the necessarily-implied assertions upon which this argument is based: that results of the application of a national policy in only one state, and the exclusion of certain patients days through application of a national policy that occurs in only one state, necessarily invalidate the national policy, or, in the alternative, exempt that state from application of the national policy.

1395gg(c) applies to providers was rejected in *Visiting Nurses Ass'n of Southwestern Indiana, Inc. v. Shalala*, 213 F.3d 352, 356-59 (7th Cir. 2000). I find the court's reasoning in that case persuasive here.

The plaintiffs cite a much earlier case, *Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329 (5th Cir. 1975), without a pinpoint citation, for the proposition that "refinements to 42 U.S.C. § 1395gg affect[] the Department's right to recoup from providers by making non-fault a defense[.]" Plaintiffs' Motion at 27. However, in that case, the court observed that section 1395gg "does not by itself authorize recoupment from providers," 517 F.2d at 336, and went on to hold that the statutory prohibition against services that are medically unnecessary, 42 U.S.C. § 1395y(a)(1), is "exactly the kind of limitation which under federal common law creates both a legal claim in the government and a remedy by way of setoff[.]" *Id.* at 337. This conclusion informed the court's consideration of amendments to the Medicare statutes made by Congress in 1972, and puts the sentence from the opinion paraphrased in the plaintiffs' citation here, *id.* at 342, into its proper context, leading to the court's conclusion that "recoupment has always been available to HEW under facts like those of the instant case." *Id.* at 343. None of this supports a conclusion that section 1395gg includes providers within the term "individuals." Indeed, *Mount Sinai* proceeds from an assumption that the government has a common law right to recoup overpayments made to providers that is affected, but not supplanted, by the terms of section 1395gg.[7]

The plaintiffs next contend that the defendant must be bound by the action of the Acting Administrator of CMS at the 2004 meeting, Record at 230-31, at which CMS applied the "without

---

[7] The plaintiffs assert that "the Secretary's sole authority for her argument . . . is a statement regarding a proposed regulation that she never finally adopted." Plaintiffs' Motion at 25. Neither the defendant's motion nor her reply memorandum cites any such proposed regulation, and, accordingly, I disregard this argument.

fault" test to the plaintiffs' claims. Plaintiffs' Motion at 25-26. Without citation to authority, they assert that "[i]f CMS truly believed that the 'without fault' test did not apply in this situation, it would have said so in 2004." *Id*. at 25. A court does not base its resolution of a dispute upon an assessment of what a party "truly believed" at any given time, as opposed to its statements or arguments to the court. The plaintiffs' conclusory assertion that the defendant "cannot now suggest that the test does not apply, as she used it in this very case," *id*. at 26, is contrary to established case law. *See, e.g., Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (administrative agency not disqualified from changing its mind).

Finally, the plaintiffs contend that the defendant acted arbitrarily and capriciously in this case because other hospitals "were allowed to keep DSH overpayments related to days claimed in the Medicaid Fraction even though the days were not even Medicaid-eligible patients." Plaintiffs' Motion at 26. The only authorities they cite for this contention are PM A-99-62 and page 1375 of the Record, which is an empty page. Assuming that the intended reference is a letter dated May 6, 2005, to Senator Snowe from Mark B. McClellan, found at pages 1372-73 of the record, the relevant passage is the following:

> You also indicate in your letter that we had not fully explained why Maine hospitals were not offered the same relief as hospitals in states with similar circumstances. I believe you are referring to the policy embodied in Program Memorandum (PM) A-99-62, issued in 1999. The PM A-99-62 holds harmless hospitals that were provided erroneous information by state agencies that would be very difficult to determine was incorrect. Certain state agencies, including those in New York and Pennsylvania, incorrectly added state-only program days (non-Medicaid) to the Medicaid patient day count. The hospitals relied on this information from the state with little ability o know that the correct data were inadvertently commingled with incorrect data. The hospitals and FI involved were unaware that the date they received were inaccurate.
>
> The PM A-99-62 did not address dual-eligible days. In Maine, dual-eligible days were incorrectly added to the Medicaid patient day count. The statute specifies that Medicaid patient days consist of days for patients

who were eligible for Medicaid but who were not entitled to Medicare Part A. Even though the Maine hospitals were advised incorrectly by the FI, providers are responsible for knowing and following Medicare statute and regulations. PM A-99-62 was not designed to be applied in such situations and therefore cannot hold harmless the Maine hospitals that incorrectly added dual-eligible days to their DSH calculation.

Record at 1373.

This explanation establishes that the agency performed the examination of relevant data and articulation of a satisfactory explanation for its action including a rational connection between the facts found and the choice made that is required to meet the "arbitrary and capricious" standard. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Particularly where, as here, the party asserting that an action was arbitrary and capricious has cited no authority in support of that position, the deference due to the agency's interpretation of its own regulations and the statute underlying those regulations is not seriously challenged.

### D. Reliance on the Fiscal Intermediary

The plaintiffs contend that they must be held harmless from any claim of overpayment by the defendant because the conduct alleged to have resulted in the overpayment was undertaken in accordance with the directives of the Fiscal Intermediary. Plaintiffs' Motion at 27. This argument was specifically rejected in *Faith Hosp. Ass'n v. Blue Cross Hosp. Serv.*, 537 F.2d 294, 295 (8th Cir. 1976). More important, it was generally rejected, in the context of cost reimbursement under Medicare, in *Heckler v. Community Health Servs. of Crawford County,* 467 U.S. 51, 64 (1984), for reasons that are equally applicable here.

### E. Reopenings

The plaintiffs' final argument asserts that the Fiscal Intermediary's reopenings of the cost reports at issue, the procedural means by which the defendant could recoup overpayments, were improper for three reasons. Plaintiffs' Motion at 29. Those reasons are that the Fiscal Intermediary

lacked the authority to reopen cost reports subject to a settlement agreement or Administrative Resolution; that the original reopening notices were defective; and that the Fiscal Intermediary did not have the authority to reopen the cost reports without written instruction from CMS. *Id*.

### 1. Improper Notice

With respect to the claim that the notices of reopening were defective, the plaintiffs state that the test "generally used" by the Fiscal Intermediary in letters issued in 2003 and 2004 "purporting to reopen the cost reports at issue[]" was the following: "To review and correct disproportionate share hospital (DSH) payment calculation in accordance with section 1886(d)(5)(F) of the Social Security act and 42 CFR 412.06." Plaintiffs' Motion at 29. The defendant apparently agrees. Defendant's Motion at 29**.**

The plaintiffs contend that this language does not meet the requirements of 42 C.F.R. § 405.1885 "as interpreted by CMS in the Provider Reimbursement Manual, CMS Pub. 15-1 ('PRM'), Sections 2931 and 2932." Plaintiffs' Motion at 30. The specific failures alleged by the plaintiffs are a failure to advise them "as to the circumstances surrounding the reopening, i.e.; why it was necessary to take such action, and the opportunity to comment, object, or submit evidence in rebuttal[,]" and as to "which of the many aspects of the DSH payment was to be examined." *Id*.

The defendant admits that the letters did not meet these requirements of the Provider Reimbursement Manual, but contends that, because "the interpretive provisions of the PRM do not have the force and effect of law and are not accorded that weight in the adjudicatory process[,]" Defendant's Motion at 30 (citation and internal quotation marks omitted),[8] it is within the

---

[8] The citation given by the defendant at this point in her motion, to *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 100 (1995), Defendant's Motion at 30, should be to page 99 of the opinion. The issue in that case was whether a specific provision in the Provider Reimbursement Manual was an interpretive rule rather than one that would require formal rule making under the Administrative Procedure Act. 514 U.S. at 95-99. The defendant's citation of this passage assumes that the cited provisions of the Provider Reimbursement Manual are interpretive rules, an assumption that is not justified on the showing made.

defendant's discretion "instead to focus on whether the basic requirement of fair notice had been satisfied." No authority is cited in support of this contention, which does not necessarily follow from the stated premise.

The defendant's Provider Reimbursement Review Board found that notices of reopening issued between June 3, 2003 and September 27, 2004, all of which included the language quoted above, did not satisfy the requirements of 42 C.F.R. § 405.1887 "or the program instructions at CMS Pub. 15-1 § 2932(A)[,]" and that the notices therefore were not proper, resulting in a finding that the reopening adjustments made to cost reports subject to those notices were improper. Record at 62, 65.[9] The Board rejected the arguments that are made here by the defendant. *Compare* Defendant's Motion at 30-32 *with* Record at 62-63.

The CMS Administrator decided to review the Board's decision and reversed the finding that the specified notices of reopening were fatally deficient, stating only that "the notices were sufficient to notify the Providers as to the nature of the reopenings, the Providers were given ample opportunity to submit additional evidence and arguments, and Providers were on notice as to the basis for the revisions for the issued revised NPRs." Record at 25. If an agency's "overt failure to follow the terms of its own policy" is substantial evidence that it acted unreasonably and in bad faith, *Massey v. Farmers Ins. Group*, 986 F.2d 1428 (table), 1993 WL 34770, at *6-*7 (10th Cir. Feb. 9, 1993), then it certainly can serve to invalidate an act that deviates substantially from that policy, as is the case here. The Administrator's reversal of the Board on this issue bears the hallmark of arbitrary and capricious self-interest.

---

[9] I reject the defendant's contention that the Board's decision on this point must be rejected because it used the word "revision" rather than the word "reopening" in its opinion. Defendant's Motion at 30 n.12; Record at 62.

## 2. Premature Notice

The plaintiffs also contend that, because the Fiscal Intermediary "specifically instructed the Plaintiffs to claim the non-SSI Type 6 Days[,]" the reopenings were not "permissive," which would invoke 42 C.F.R. § 405.1885(a), but rather were "mandatory" under 42 C.F.R. § 405.1885(b), requiring that CMS explicitly direct the Fiscal Intermediary to reopen the determinations at issue, which was not done in this case. Plaintiffs' Motion at 30-31. If the reopenings were "mandatory," the plaintiffs assert, notice could not be provided before May 6, 2005. The plaintiffs' brief discussion of this issue does not convince me that their reliance on the Fiscal Intermediary's advice requires reopening only under 42 C.F.R. § 405.1885(b).

## 3. Effect of Settlement Agreements

The plaintiffs' final argument is that the reopening violated certain unspecified settlement agreements that some of the plaintiffs had reached with the Fiscal Intermediary for some of the years at issue. Plaintiffs' Motion at 32-34.[10] The defendant's response, that she is not bound by the settlement agreements because only the Fiscal Intermediary was a party to the proceedings before the Board, is certainly troubling. The logical extension of this argument is that providers are always bound by such settlement agreements, but DHHS never is. Certainly, that state of affairs is not likely to be what the providers thought their settlements meant.

In any event, the case law cited by the defendant is distinguishable. *Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437 (7th Cir. 2000), holds only that the Secretary of DHHS cannot be bound by a stipulation entered into at a PRRB hearing by counsel for the provider and counsel for the fiscal intermediary. Similarly, the cited footnote in *Appalachian Reg'l Healthcare, Inc. v.*

---

[10] The defendant contends that only two settlement agreements could possibly be at issue in this regard, although it does not specify which two. Defendant's Motion at 33.

*Shalala,* 131 F.3d 1050 (D.C. Cir. 1997), says only that "a statement by intermediary's counsel in the course of an internal quasi-judicial proceeding is not the sort of fair and considered judgment that can be thought of as an authoritative departmental position"), *id*. at 1053 n.4 (citation and internal quotation marks omitted). In *United States v. Estate of Rogers*, No. 1:97CV461, 2001 WL 818160 (E.D. Tenn. June 28, 2001), an opinion cited by both parties, the holding again is that

> [t]he Secretary of HHS is not bound by the stipulation entered into by the FI at the PRRD proceeding. . . [T]he Secretary of HHS and HCFA were not parties to and did not participate in the PRRB proceeding. The Court will not hold HHS and HCFA responsible for a stipulation they had no chance to challenge and that may conflict with HCFA's official position.

*Id*. at *17.

These opinions, therefore, do not constitute persuasive authority for allowing the defendant to disregard settlement agreements entered into before any Board proceedings took place and in which the Fiscal Intermediary could only be acting as the agent of the defendant, because it was making commitments about Medicare funds. The agreements themselves purport to be full and final settlements of the issues raised concerning the costs reports for the years at issue. *E.g.,* Record at 1403.

The defendant presents, as an example, the agreement concerning Eastern Maine Medical Center's 1995 cost report, which it contends purported, by its terms, to resolve any claims that the hospital asserted or could have asserted in an appeal. Defendant's Motion at 33-34. Because the Fiscal Intermediary had not taken any action to remove dual-eligible days at that time, the defendant contends, EMMC could not have raised an issue with respect to the exclusion of such days in an appeal of its 1999 cost report. *Id*. at 34. This is simply another way of stating the defendant's argument that it can reopen cost reports that have been settled by written agreements

between providers and fiscal intermediaries for any reason and whenever she likes. The court should reject this argument.

### IV.  Conclusion

For the foregoing reasons, I recommend that the plaintiffs' motion for judgment be **GRANTED** as to the cost reports for which the Provider Reimbursement Review Board found that the notices provided to specific plaintiffs were inadequate and as to the cost reports for providers and years covered by written settlement agreements entered into by individual providers and the Fiscal Intermediary and otherwise **DENIED**; and that the defendant's motion for judgment be **GRANTED** as to all other plaintiffs and costs years included in the defendant's decision that is under review in this proceeding and otherwise **DENIED**. The parties shall inform the court no later than ten days from the date of this recommended decision if they are unable to agree on the specific settlement agreements that meet the criteria of section III.E.3 of this recommended decision, so that the court may arrange for a procedure to resolve any such disagreement.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which* <u>*de novo*</u> *review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to* <u>*de novo*</u> *review by the district court and to appeal the district court's order.*

Dated this 10th day of August, 2014.

                                        /s/  John H. Rich III
                                        John H. Rich III
                                        United States Magistrate Judge